DECISION
This matter was tried before the Court, jury-waived.
 Findings of Fact
Timothy and Pamela Scott owned a single family home on Solar Drive in Westerly, Rhode Island. In the fall of 2003 they considered expanding their home to include a master bedroom. After receiving a design plan, they met with several builders including Mr. Raiche of T. Raiche Builders. The Scotts told Mr. Raiche the extent of their budget for the project. Mr. Raiche reviewed the plan with them and asked the Scotts to carefully consider specific details not referenced on the plan. The Scotts created a "wish list" for Mr. Raiche, exhibit 5, and discussed it with him. After Mr. Raiche reviewed these documents completely and determined some of the costs he would incur, he agreed with Mr. and Mrs. Scott to complete the construction work for $240,000. The agreement was memorialized in a writing of November 20, 2003, signed by the parties, and submitted as Exhibit A of this trial.
Exhibit A states, in part:
 Any Alteration or deviation from the above specified involving extra costs will be executed only upon written orders, and will become an extra charge over and above the original contract price.
 * * * *Page 2 
 Any Change work orders that may be signed will have payment terms written on the order.
Although the November 20, 2003 writing may have been drafted to assist Mr. and Mrs. Scott to obtain bank financing of the project, it is the only written agreement between the parties, other than the work sheets (exhibit 4 and 5). While exhibit 5 is the "wish list", exhibit 4 is a job quotation form, prepared by Mr. Raiche used to price the plans.[1] In it, he has priced out various costs, added in labor costs for 8.5 weeks, added "sub fees" and added "cost of doing business/overhead".
In January of 2004, construction commenced. The project took nine months to complete and, as with most construction, some unexpected changes occurred. A load-bearing beam needed to be installed because the wish list resulted in changes to the kitchen plan. Under the contract, any changes that involved extra costs had to be executed only upon written orders, and any such change order had to include the payment terms. While the parties all recognized this beam would be added, no additional costs or charges were ever discussed between the parties, and no such change work order was executed.
Some of the outside stone work was also redesigned. Mr. Raiche directed the redesign with the stone mason. Mr. and Mrs. Scott assumed that they were within their allowance under the contract. Mr. Scott requested a specific boiler be installed. Mr. Raiche directed the plumber accordingly. The Scotts assumed that the boiler was within their allowance for the plumbing under the contract. Mr. and Mrs. Scott requested a redesign of some of the kitchen plumbing. Mr. Raiche redirected the plumber accordingly. The Scotts assumed that this work was within their allowance for plumbing under the contract. *Page 3 
While all of the subcontractors were enlisted by T. Raiche Builders and directed by Mr. Raiche, the electrician had several discussions with Mr. and Mrs. Scott, independent of Mr. Raiche. Eventually, a new lighting plan was given to the electrician by Mr. Scott. These upgrades increased the cost of the electrical work to $14,455. Exhibit A. On the job quotation form, Mr. Raiche had written $6750 for electricity, and $3200 for electricity/allowance.[2] Although Raiche Builders paid the electrician's bill initially, Mr. Raiche never agreed to this work as part of the project. Surprisingly, Mr. Raiche, an experienced builder, did not formalize the significant changes to the project with a new writing.
In November, 2004, after the project was complete, Raiche Builders submitted an invoice to Mr. and Mrs. Scott totaling $318,242.80 in charges. It credited them with prior payments of $189,500, and left a remaining balance of $128,742.80. See Exhibit 10. As the cost of the support beam was listed inadvertently, Mr. Raiche acknowledges that this bill should be reduced by $2540. Since the bill, Mr. and Mrs. Scott have paid additional monies into the registry of the court.[3]
Mr. Raiche bases his bill on "time and materials". Exhibit 10 contains charges for carpenters and laborers, apparently billed by time. The other entries appear to be for materials and cost of doing business. In calculating the time and materials billed, Raiche Builders included the monies which he paid to subcontractors. Five of the subcontractors testified on their work and their contractual relationship with Raiche Builders. Mr. Raiche added eight percent to his invoice as profit. His testimony revealed that although he charged *Page 4 
$32 to $35 on his bill for his laborers, he actually paid them less. He marked up their costs and the costs paid to some subcontractors as a cost of doing business.
 Presentation of the Witnesses
Credibility of witnesses is always a concern for a finder-of-fact. However, in this action, there were few, if any, disagreements of fact. The parties agreed that there was no formal written contract between them, except for Exhibit A. The parties agreed that the renovation project was quoted at $240,000. The parties even agreed that no additional costs or charges were referenced during the project and that Mr. and Mrs. Scott dealt with the electrical subcontractors on their own. Mr. Raiche never disputes the Scotts' claims that they needed to hold to a $240,000 price, or the Scotts' claim that "time and materials" were never referenced as a pricing mode until after the invoice was produced. Mr. Raiche asserts that although the agreement set a $240,000 price, the parties agreed the work would be done on a time and materials basis, apparently in complete derogation of the writing.
Mr. Raiche was well prepared, responsive and consistent. While he was scant on certain facts such as what discussions occurred at the outset with Mr. and Mrs. Scott, his candor about the initial price and the lack of ongoing discussions increased his credibility. However, throughout his examinations he was reluctant to speak in definitive dollar amounts, even when asked about his own computations. On cross-examination, he claimed that the parties had all agreed on a time and materials pricing, and acknowledged that he estimated the price to be $240,000 at the outset.
Mr. Scott testified succinctly. While he was educated, professional, responsive, clear and respectful, he did not seem sophisticated in dealing with building contractors. The Court *Page 5 
found Mr. Scott quite credible particularly because his testimony was consistent with that of all other witnesses.
The Court also found the subcontractors fairly credible, though their knowledge of the job six years earlier was reasonably limited. Each of the subcontractors testified as to their work on the project. Their bills were consistent with the costs enumerated by Mr. Raiche. Each of them described their subcontracts and seemed protective of Mr. Raiche.
 ANALYSIS The Contract Claim
In cases where an agreement between the parties has been reduced to a writing, this Court is often called upon to determine the meaning of that writing. In this case, however, Mr. Raiche is not asking the Court to interpret the meaning of the written agreement that both he and the Scotts signed. Rather, Mr. Raiche is asking this Court to disregard that written agreement and substitute in its place an oral agreement he alleges existed between the parties. Mr. Raiche's breach of contract action is based, not on the Scott's breach of the signed written agreement, but on their breach of the alleged oral agreement.
For over a century, Rhode Island courts have recognized that
 [i]f parties have put their contract into writing, the written instrument is to be regarded as the only evidence of the contract as finally concluded. Oral evidence of what was said or done during the negotiations will not be admitted either to contradict what is written or to supply terms with respect to which the writing is silent. The purpose of the rule is to enable parties to make their written contracts the only evidence of their undertakings, and to protect themselves against the hazard of uncertain oral testimony in respect to their engagements. . . . The only exception to the rule is when the written contract is incomplete, and it is apparent from an inspection of the instrument that it does not embrace the entire contract. In such *Page 6 
a case oral testimony may be resorted to supplement, but not to vary or contradict, what is written. Myron v. Union Railroad Co., 19 R.I. 125, 32 A. 165 (1895) (emphasis added).
This language in Myron is of the earliest expressions of the parol evidence rule by a Rhode Island court. While the parol evidence rule has been expounded upon since our high court's ruling some 115 years ago, this principal framework has remained basically unchanged.[4]
The parol evidence rule is not a rule of evidentiary law, but a rule of substantive law. Quinn v. Bernat,80 R.I. 375, 97 A.2d 273 (1953).
 [T]he rule "does not exclude certain data because they are for one or another reason untrustworthy or undesirable means of evidencing some fact to be proved. What the rule does is to declare that certain kinds of fact are legally ineffective in the substantive law; and this of course (like any other ruling of substantive law) results in forbidding the fact to be proved at all." Golden Gate Co. v. Barrington College, 98 R.I. 35, 39-40, 199 A.2d 586, 589 (1964) (quoting 9 Wigmore, Evidence
(3d ed.), § 2400(1), p. 3).
Our Supreme Court has had many opportunities to address the application of the parol evidence rule. Id. at 40. InGolden Gate Co., the Court set out a framework for courts to follow in applying the rule.
First, the trial court should determine whether a document "was adopted by the parties as a final and complete expression of their agreement," or "was only a partially integrated writing."Id. at 41. In making this determination, the trial court cannot look at the instrument alone, as it "does not in or of itself prove completeness." Id. The trial justice must allow "wide latitude . . . for inquiry as to whether the parties intended that the writing *Page 7 
constitute an integration of all of their prior agreements and negotiations." Id. In determining what prior negotiations and agreements were intended to be "covered or adopted by the writing," extrinsic or parol evidence of these agreements "should be admitted preliminarily by the trial justice, and out of the hearing of the jury if there b[e] one." Id. at 42. If the trial justice is
 satisfied on the evidence so admitted that there is an issue of fact as to the existence of a prior or contemporaneous oral agreement, [he or she] must then determine whether the collateral terms are consistent with the written and are such as would normally be excluded from the written contract by the parties. Id.
This step in the analysis is a critical one. The trial justice can either find that "the collateral terms are consistent with the written and are such as would normally be excluded from the written contract by the parties," or that they are not. Id.
 If [the trial justice] finds [they are consistent], then and only then may that evidence be considered by the trier of the facts for his determination of the ultimate question of whether in fact the agreement consisted of what was written as well as what was oral. Id.
 * * *
 If on the other hand, what is collateral is inconsistent with the writing or is such that the parties would naturally and normally have included one in the other, then the extrinsic evidence originally admitted preliminarily must be excluded and may not be considered by the trier of facts. Id. (emphasis added).
In accordance with the above detailed analysis, this Court heard Mr. Raiche's testimony concerning both the circumstances surrounding the alleged oral agreement and the terms of that alleged agreement. Next, the Court reviewed the writings executed by the parties. A review of these writings revealed that while the writings integrated certain aspects of the agreement in great detail, they were completely silent on other aspects of the *Page 8 
agreement. For example, the instruments included terms such as that the master closet was to have "shoe racks" and the wall paint was to be "eggshell sheen," but excluded other terms, such as when the contract was to be performed.
In considering both the writings and the testimonial evidence presented at trial, this Court finds that the written agreement was not a full integration of all the terms of the entire agreement between the parties. However, as the writings did contain many of the terms of the agreement, they were at least a partial integration of that agreement. Therefore, in finding the written agreement to be an incomplete expression or "partial integration," this Court proceeds to the final step of the analysis — comparing the terms of the alleged oral agreement to those of the written agreement.
Both the contract drafted by Mr. Raiche and the job quotation form contain numerous terms concerning the pricing of the project. The job quotation form lists a number of items, their associated costs, and notes the number "240855" at the bottom of the last page. This number roughly corresponds to the $240,000 price stated in the written contract. The written contract itself contains numerous terms explaining which elements of the construction are included under the contract and which elements are not. The contract also explains which elements are provided for by an allowance, and which elements will be provided for only at extra cost. Moreover, the contract contains the following provision: "Any [a]lteration or deviation from the above specified involving extra costs will be executed only upon written orders, and will become an extra charge over and above the original contract price."
Comparing the numerous and thorough pricing provisions of the written agreement with those purported to have existed as part of the alleged oral agreement, this Court finds *Page 9 
that the oral and written terms are in direct contradiction. Mr. Raiche alleges that the oral contract called for pricing to be calculated on a time and materials basis; whereas, the written agreement called for a set price of $240,000. Furthermore, Mr. Raiche claims that under the terms of the alleged oral agreement, he is due a sum well in excess of the stated contract price. This claim directly contradicts the written provision of the contract that required "Any [a]lteration or deviation from the above specified involving extra costs will be executedonly upon written orders, and will become an extra charge over and above the original contract price." (emphasis added). This provision of the written agreement entitled the Scotts to notice of additional costs as well as an opportunity to avoid those additional costs by refusing to authorize the changes. However, under the alleged oral agreement, [5] Mr. and Mrs. Scott do not have the same contractual right to notice and an opportunity to refuse additional costs. As such, the alleged oral terms contradict the written ones.
While this Court is entitled to consider parol evidence for the purpose of "supplement[ing] an agreement that is incomplete or ambiguous on its face[]," Lisi v. Marra,424 A.2d 1052, 1055 (R.I. 1981), it cannot consider that evidence for the purpose of contradicting such an agreement. Myron,19 R.I. at 125, 32 A. at 165; Golden Gate Co.,98 R.I. at 42, 199 A.2d 590. In this case, Mr. Raiche chose to draft and sign a written contract with the Scotts. The contract contained numerous provisions regarding costs and clearly stated a contract price. "[T]he usual rule is that if there is no fraud, duress, or mutual mistake, one who has the capacity to understand a written document, who reads and signs it, or without reading it or having it read to him, signs it, is bound by his signature as to all of its terms." Westerly Hospital v. Higgins,106 R.I. 155, 160, 256 A.2d 506 (1969) (citation omitted). In the words of Judge Selya, "Were it otherwise, signed contracts would be little *Page 10 
more than scraps of paper, subject to the selective recollection of the parties in interest." D'Antuono v. CCH Computax Systems,Inc., 570 F.Supp. 708, 714 (D.R.I. 1983).
Because the oral pricing terms contradict the written pricing terms, the written pricing terms must govern. SeeMyron, 19 R.I. 125, 32 A. 165; see also Golden GateCo., 98 R.I. 35, 199 A.2d 586, Under the written terms, the allegations made by Mr. Raiche and the evidence presented at trial establishes that Mr. and Mrs. Scott breached the agreement in only one respect: They did not pay the agreed amount due. As Mr. and Mrs. Scott made payments of $239,500 while $240,000 was the agreed price, $500 is still due.
 The Electrical Work
Each of the subcontractors testified at trial that they worked under the direction of Mr. Raiche, the general contractor for the addition to the home. Mr. Federico painted the interior, Mr. Cassidy formed the concrete, Mr. Cillino performed masonry work, Mr. Fussaro installed plumbing, and Mr. Brough installed the electrical wiring. Each of these individuals reported only to Mr. Raiche, gave him their prices, and were paid by Mr. Raiche. Their contracts were solely through Mr. Raiche. While several of the subcontractors would have conversations with Mr. and Mrs. Scott, the Scotts knew that the written contract provided them with allowances for much of the work, and worked with the subcontractors in selecting their options. Mr. and Mrs. Scott believed that their additional selections were within the original contract price, as no increase price was ever mentioned. An exception was the recessed lighting work by Mr. Brough.
Mr. Scott recognized that he was going beyond his allowance in changing the lighting plan and obtaining more light "cans" for the recessed lighting. When speaking to Mr. Scott *Page 11 
directly, Mr. Brough informed Mr. Scott that the additional work was not mentioned in the original price. Mr. Scott acknowledged that he received additional work and materials, but contended that the additional work balanced out with the cost savings he brought to Mr. Raiche for other work. This additional work was done without Mr. Raiche's consent or pre-approval. The work was billed to Mr. Raiche and Mr. Raiche paid Mr. Brough, obviously desiring to preserve his relationship with his electrician.
Mr. and Mrs. Scott were unjustly enriched in obtaining this electrical work at Mr. Raiche's expense. It is inequitable for them to receive the products of the electrician's work without compensating Mr. Raiche for incurring the expense. The Scotts are responsible to Mr. Raiche for the excess charges he incurred in paying Mr. Brough for work requested by the Scotts, over and above the contract. Mr. Brough's total bills were $14,455. Mr. Raiche had calculated the contract price based on a bill from Mr. Brough of $6750 and an additional electrical allowance of $3200, exhibit 4. As Mr. Raiche used these two figures, totaling $9950 to price the contract, Mr. Raiche was shortchanged by $4505, and lost his normal 10% profit of $450.50. Therefore, Mr. and Mrs. Scott are liable to Mr. Raiche for $4955.50, as they were unjustly enriched, to the detriment of Mr. Raiche, who incurred the loss.
 Offer of Judgment
Prior to the trial, the parties reserved their rights to claim that liability was previously established by an offer of judgment. On August 6, 2008, Mr. Raiche filed an Acceptance of Offer of Judgment. In it Mr. Raiche attempts to accept the offer of the Scotts to pay monies into the Registry of the Court and to proceed on the sole issue of damages. Oddly it appears *Page 12 
that the Offer of Judgment itself was never filed with the Court, nor had Mr. or Mrs. Scott actually given the monies to the Court.
During prior hearings with another justice of this Court, the Court construed Super. R. Civ. P. 68 in an attempt to discern the extent of the liability of Mr. and Mrs. Scott, based on their offer of judgment. Pursuant to R.C.P. 68(b):
 (b) Payment Into Court. A party defending against a claim may pay into court by depositing with the clerk a sum of money on account of what is claimed, or by way of compensation or amends, and plead that the defending party is not indebted to any greater amount to the party making the claim or that the party making the claim has not suffered greater damages. The party making the claim may (1) accept the tender and have judgment for the party's costs, (2) reject the tender, or (3) accept the tender as part payment only and proceed with the action on the sole issue of the amount of damages.[6]
Mr. Raiche used the generosity of Mr. and Mrs. Scott, in attempting to pay a balance they did not wish to contest, to infer that Mr. and Mrs. Scott were liable for much more.
On October 6, 2008, another justice of this Court held "the only issue before the Court is not an issue of liability. It is an issue solely of the amount of damages owed." Transcript of October 6, 2008, pp. 8-9. The justice then ordered the $50,000 to be deposited to the Court Registry. According to the court docket, the funds were deposited into the Registry on February 11, 2009. In October, 2009 the funds (with accrued interest) were transferred to counsel for Mr. Raiche. Prior payments by Mr. and Mrs. Scott totaled *Page 13 
$189,500. After the $50,000 was paid to Mr. Raiche the total payments to him totaled $239,500.[7]
The Court previously found that the only issue remaining is the amount of damages. However, the remaining issue in this case has always been the amount of damages, as each of the parties alleged and recognized a contract, a breach, and resultant injury. Indeed in all the findings above, the conclusion is to award Mr. Raiche an amount above what he has already been remitted.
 CONCLUSION
The November 20, 2004 writing between the parties constitutes the contract between the parties. Mr. and Mrs. Scott did not breach the contract, except in not paying the full amount due. Under the contract, they owe a balance of $500. Mr. and Mrs. Scott are liable to Mr. Raiche for the electrician's bill of $4955.50 for unjust enrichment. This Decision is consistent with the prior ruling of this Court regarding the Offer of Judgment.
Judgment shall enter for Mr. Raiche against Mr. and Mrs. Scott for the sum of $5455.50 plus interest and costs.
[1] At the bottom of exhibit 4 the number 240,855 appears.
[2] While some changes suggested by the Scotts increased the cost, some of the material costs were lowered by the changes.
[3] $189,500 was paid to Raiche Builders directly and $50,000 was deposited into the Registry of the Court pursuant to the offer of judgment, and disbursed to Mr. Raiche.
[4] Subsequent courts have recognized additional factual scenarios in which the parol evidence rule has been deemed "inapplicable."See Fram Corporation v. Davis,121 R.I. 583, 588-589, 401 A.2d 1269, 1273-1274 (1979). Rhode Island courts have also applied the parol evidence rule in situations where the parties are in dispute as to the meaning of the written expressions in their contract. See Pearson v. Pearson,2011 WL 193453 (R.I. 2011). However, this is not such a case. Therefore, this Court's ruling does not address how the parol evidence rule is to be applied in such cases.
[5] This Court does not find that both parties orally agreed to the time and materials billing method.
[6] R.C.P. 68 is an older rule, which took effect in concert with a statute which was effective prior to the adoption of our Rules of Civil Procedure. While the underlying statute (R.I.G.L. § 9-6-12) was repealed over 40 years ago, the rule remained. There is no comparable provision in the federal rules which has modified Fed.R.Civ.P. 68 several times. R.C.P. 68 (b) is rarely employed in Rhode Island practice and its plain language now appears to discourage persons from depositing monies which they recognize they may owe. The resultant fragment therefore disembowels an important incentive toward settlement.
[7] Mr. Raiche acknowledged, at trial, that he was not seeking the $500 difference, apparently due to adjustments from having used incorrect invoices for the costs of supplies he purchased. *Page 1